IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

|  |  |  |
|---|---|---|
| WENDY WHITAKER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 4:06-140-CC |
| SONNY PERDUE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION TO STOP THE STATE OF GEORIGA FROM CRIMINALIZING PROTECTED RELIGIOUS ACTIVITY

In the 2008 General Assembly session, Senate Bill 1 expanded Ga. Code Ann. § 42-1-15 to provide that "No individual [who is required to register as a sex offender] shall be employed by <u>or volunteer at</u> any . . . church[]."[1] This statute, effective July 1, criminalizes fundamental religious activities and subjects violators to 10-30 years in prison. In denying Defendants' motion to dismiss the former version of the law, which barred only employment at a church, this Court already expressed concerns that:

---

[1] *See* SB 1 (emphasis added) (Exhibit 1).

- "This provision would effectively exclude all registered sex offenders from serving as clergy or ministers in religious organizations" and

- "This provision may operate as a substantial burden on religious practice that does not survive scrutiny."[2]

The new statute is worse.  It both exacerbates and expands the free exercise problems and intrudes upon core church functions and decisions.  Under SB 1, activities such as singing in an adult choir, looking up passages for the pastor in Bible study, preparing for revivals and prayer vigils, or cooking meals in a church kitchen will now be considered criminal activity punishable by 10-30 years in prison.[3]  And, despite a religious organization's own desires and decisions, it may not ever employ a person on the registry or ask such a person to serve as a choir member, on a church committee, or in any other capacity.

After two years of being driven from homes and deprived of employment, many people on the registry found their last bastion of hope and solace in faith communities.  Now, the State is depriving Plaintiffs of the support and rehabilitative influence of their churches.  Lori Collins, Angela Coffey, Andrew

---

[2]     *See* Order of 03/30/07 at 35.

[3]     Because the term "church," means "a place of public worship" under § 42-1-12, the prohibition against volunteering at a "church" extends to all faiths.

Norton, Donnie Boone, Omar Howard, and over 15,000 others will be prosecuted if they volunteer at churches, even though none of the activities in which they participate involves unsupervised contact with minors. The prohibition against volunteering at a church is substantially overbroad, vague and intrusive of core rights to free exercise of religion.

## STATEMENT OF FACTS

The volunteer/employment provision of Ga. Code Ann. § 42-1-15 undermines core religious freedoms for thousands of persons and criminalizes sex offenders' participation in one of the key rehabilitative structures – the church. The Declarations attached to this petition illustrate the problems:

### A.    Lori Collins

Lori Collins is on the registry because, at age 39, she was convicted of statutory rape for having sex with a 15-year-old.[4] While serving three years in prison, Ms. Collins lived in the honor dorm, served as assistant to the chaplain, and completed the Department of Corrections Faith and Character Program.

Ms. Collins has come a long way since she was sent to prison. She is now a licensed minister and will soon be ordained through the Church of the Firstborn

---

[4] *See* Declaration of Lori Collins (Exhibit 2).

in Woodstock, Georgia.  She attends Mt. Paran Church of God.  She is also active in prison ministry outreach.

As of July 1, 2008, Ms. Collins' ability to practice her faith will be limited in the following ways:  First, she will no longer be able to help to prepare for or participate in retreats, revival meetings, seminars, or prayer vigils.  Second, Ms. Collins will no longer be able to participate in prison ministry because the planning meetings and training seminars for prison ministry outreach are held at churches.  Third, Ms. Collins will no longer be able to assist the pastor or perform administrative functions at two evangelical ministries, New Beginnings Tabernacle and the Church of the Firstborn.  Ga. Code Ann. § 42-1-15, as amended, requires Ms. Collins to stop doing activities that she believes the Bible commands her to do, especially the commandment to spread the faith.[5]

Section 42-1-15 (2006) has already affected Ms. Collins' religious practice.  In 2006, she was offered a position in the media ministry at Mt. Paran Church of God.  This opportunity would have let her spread the Word of God through print media.  She could not take the job because of § 42-1-15.  Also, in 2006, Ms.

---

[5]     *See Matthew* 28:18-20 ("Then Jesus came to them and said, 'All authority in heaven and on earth has been given to me.  Therefore go and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you.'")

4

Collins volunteered as a prayer partner at Trinity Broadcasting Network ("TBN"). She was required to stop volunteering because TBN was within 1,000 feet of a church.

None of Ms. Collins' church activities involve working with minors. Ms. Collins does not seek to engage in any activity that would cause her to violate probation conditions by being around minors unsupervised. She only wants to continue to serve God by being active in the church.

Ms. Collins does not understand what the bar on "volunteer[ing]" at a church means. Does it mean that she cannot help prepare for revival meetings, assist with Bible study, or serve on a church committee? Because the penalties for volunteering at a church are severe, Ms. Collins must stop participating in the religious activities that are so important to her. Ms. Collins finds herself in an impossible situation. If she volunteers at a church, she is subject to 10-30 years in prison. If she does not participate in her church community in a way that constitutes "volunteering," she will break God's law.

**B.     Angela Coffey**

Angela Coffey, age 35, pled guilty to having sex with a 17-year-old student while employed as a teacher.[6] She was sentenced to one year in prison and two years of probation. She was released in January 2008, and lives with her daughter.

Ms. Coffey is a churchgoer and would like her daughter to be raised in the church. Ms. Coffey wants to participate fully in the life of her church, but in two weeks she will no longer be able to do so. As of July 1, § 42-1-15 will prohibit Ms. Coffey from doing the following activities: participating in Bible study, serving on church committees, reading passages of the Bible aloud during services, and helping to prepare for church gatherings.

According to the terms of her probation, Ms. Coffey cannot be alone around minors. She does not seek to engage in any activity that would cause her to violate probation conditions by being around minors unsupervised. She only wants to participate fully in the life of the church, believing that such participation benefits both her and her daughter.

---

[6]     *See* Declaration of Angela Coffey (Exhibit 3).

### C.      Donnie Boone

Donnie Boone is a construction worker from Augusta, Georgia.[7]  Mr.

Boone was convicted in the 1994 armed robbery of a restaurant during which a

17-year-old restaurant employee was told to move from one area of the

restaurant to another.  Under Georgia law, this constituted kidnapping of a

minor, requiring Mr. Boone to register as a sex offender.  Mr. Boone has never

been convicted of a sexual offense.

Mr. Boone was granted parole in 2006, but was not released until April

2008.[8]  He attends Franklin Covenant Baptist Church in Hephzibah, Georgia.  Mr.

Boone's family members have volunteered at church for generations and he

would like to follow in their footsteps.  Mr. Boone believes that if he is going to

serve God, he must have fellowship in the church and volunteer.

Specifically, Mr. Boone would like to volunteer as an usher, welcoming

congregants into services and passing out programs.  In doing so, Mr. Boone

believes he would be helping his church community to hear God's word.  Mr.

Boone would also like to be able to serve on a church committee, to actively

---

[7]      *See* Declaration of Donne Boone (Exhibit 4).

[8]      Mr. Boone remained in prison for two additional years after he was
granted parole because he could not find an address that complied with the
1,000-foot sex offender residence restrictions.  *See id.*

participate in Bible study, and to perform other functions that constitute
volunteering at a church.

None of Mr. Boone's church activities involves working with minors. He
will not engage in any activity that would cause him to violate parole conditions
by being around minors unsupervised. He only wants to serve God by
spreading His word and being active in the Church. Attending church and
spending time around his faith community helps Mr. Boone to understand God's
commandments and to make good life choices.

### D.    Andrew Norton

Andrew Norton, 25, grew up in an abusive home.[9] The State eventually
terminated Mr. Norton's parents' custody of their children, but not before Mr.
Norton was abused for years. Mr. Norton is on the registry for an offense he was
alleged to have committed against his step-brothers when he was 12.

Mr. Norton lives with his wife and two daughters in Austell, Georgia. Due
to the 1,000-foot restrictions, Mr. Norton has been required to move four times in
the last three years. The constant moving has caused financial and emotional
strain.

---

[9]    *See* Declaration of Andrew Norton (Exhibit 5).

Mr. Norton and his family are devoutly religious and attend Trinity Fellowship Church in Marietta, Georgia.  In addition to attending services, Mr. Norton assists with soundboard operations to record the pastor's sermons and the adult choir singing praise and worship music.  Mr. Norton volunteers in this capacity as part of a ministry to spread the word about his church and pass along the message of Jesus.  He believes that he is commanded by the Bible to do this. Mr. Norton also volunteers to set up and prepare for church events.  He volunteers with other adults; his activities do not involve children.

As a Christian, Mr. Norton believes that he is supposed to help people and serve his community. His church is his community and it has helped instill normalcy and stability in his life.  His fellow congregants and pastor are an important support network.  Because the consequences of violating the volunteer prohibition are so severe, however, Mr. Norton must stop participating in many of the religious activities that are so important to him.

### E. Omar Howard

Omar Howard served fourteen years in prison.[10]  While incarcerated, he was actively involved in the church and HeartBound Ministries, an organization that ministers to the spiritual needs of people in prison.  He was also the Chaplain's Aid at Atlanta Transitional Center.

Mr. Howard has come a long way since his conviction.   He is gainfully employed and a regular churchgoer.  He speaks at churches and other gatherings about his faith, experiences, and the consequences of breaking the law.  He is a community volunteer in the Dropout Prevention Ministry Team of the First Faith Ministries of the Presbytery of Greater Atlanta.[11]  He also sings praise and worship music in the Atlanta Transitional Center choir.  As of July 1, Mr. Howard will be prohibited from accepting invitations to speak at churches.  He will also be prohibited from singing in the choir at churches.

---

[10]      *See* Declaration of Omar Howard (Exhibit 6).  At age 18, Mr. Howard was convicted of voluntary manslaughter, armed robbery, false imprisonment, and other crimes in connection with the 1993 burglary of a house.  There was a teenager in the house at the time of the burglary, leading to a conviction of "false imprisonment of a minor."  Although this crime was not sexual in nature, Mr. Howard is required to register as a sex offender.  *See* § 42-1-12(a)(9)(A), (e).

[11]      *See* Exhibit 6 (including letters from the Clayton County Juvenile Court and Rev. Yolanda Thompson attesting to the value of Mr. Howard's presentations, and a photograph of Mr. Howard speaking at a church).

## F.   Reverend Floyd Rose

Reverend Floyd Rose is the Pastor Emeritus at the Church at Pine Hill in

Valdosta.[12]  Reverend Rose believes that SB 1 will drive people on the registry

from the church and deprive the church of its rehabilitative function.  He states:

> SB 1 discourages offenders from participating in one of our society's key rehabilitative structures: the church.  Traditionally, the church has always welcomed the outcast, the locked out, and the hemmed.  It has been the place where sinners have been redeemed, the lost have been found, and the broken have been made whole.  It is the perfect place for imperfect people, including people who have violated the law by committing sexual offenses. . . .
>
> In Paul's letter to the churches, he said, "If a brother be overtaken in a fault, you who are spiritual restore such an one in the spirit of meekness." "It is the people that are sick," Jesus said, "who need a physician." The Church is about restoration, not probation.  Jesus said, "For this cause came I into the world; to seek and to save that which was lost."  Our ministry as a church is an extension of His. And since the early days of the Church, redemption has been at the heart of the church's mission and message.[13]

Reverend Rose is also concerned about the ramifications of SB 1 for him

and others in church leadership roles:

> As a person in a church leadership role, I am greatly concerned about what SB 1 means for me.  Can I be charged with accessory to a crime if I ask a person on the sex offender registry to read a passage from the Bible aloud during a service?

---

[12]   *See* Declaration of Reverend Floyd Rose (Exhibit 7).

[13]   *See id.*

Finally, Reverend Rose states that churches have a number of tools they can use to protect people from sex offenses. For example, many churches have policies to detect and stop sex abuse in their congregations. Churches can do background checks on employees and volunteers. In addition, they can check the sex offender registry, which will give them an account of who is on the registry in their community. Ultimately, Reverend Rose believes, the decision about whether it is appropriate for a particular person to be involved in church volunteering activities must be made on a case by case basis. Reverend Rose believes this decision should be made by the church, not the State.

## ARGUMENT AND CITATIONS OF AUTHORITY

A preliminary injunction is appropriate when the movant establishes: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury; (3) that Plaintiffs' injury outweighs any harm an injunction may cause Defendants; and (4) that granting the injunction would not disserve the public interest. *See K.H. Outdoors LLC v. City of Trussville,* 458 F.3d 1261, 1268 (11th Cir. 2006); *Teper v. Miller*, 82 F.3d 989, 992 n. 3 (11th Cir. 1996). Plaintiffs satisfy each requirement.

## I.   GA. CODE ANN. § 42-1-15'S PROHIBITION ON CHURCHES EMPLOYING OR HAVING VOLUNTEERS WHO ARE ON THE SEX OFFENDER REGISTRY VIOLATES THE FREE EXERCISE CLAUSE AND IS VAGUE AND OVERBROAD

### A.   The Church Employment/Volunteer Provision Violates the First Amendment

The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  It protects not only against state interference with religious beliefs, but also against state interference with religious *activity*.  *See Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) ("[T]he exercise of religion often involves not only belief and profession but the performance of . . . physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing . . . .") (internal quotations omitted); *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) ("[T]he right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions . . . .").

The Free Exercise Clause further "protect[s] religious observers against unequal treatment."  *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 542 (1993).  Unequal treatment occurs when "a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only

against conduct with a religious motivation." *Id.* at 542-43.  A law that selectively burdens conduct motivated by religious belief is subject to strict scrutiny if it is not "neutral" or "generally applicable."[14] *See Smith,* 494 U.S. 872 at 881.  Such a law will survive strict scrutiny "only in rare cases." *Lukumi,* 508 U.S. at 546; *see also Rosenburger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819 (1995) (holding that discrimination against religious viewpoints is subject to strict scrutiny).

In *Lukumi,* the Court held that a law was not "generally applicable" because it prohibited religious animal sacrifices, but failed "to prohibit nonreligious conduct that endangers [the alleged state] interests in a similar or greater degree. . . ." *Id.* at 543.  Similarly, the prohibition against working/volunteering at a church is not generally applicable.[15]  The law, on its face, applies to religious, but not secular organizations.

---

[14]    Strict scrutiny also applies when the plaintiffs assert a hybrid right - "the Free Exercise Clause in conjunction with other constitutional protections." *Smith,* 494 U.S. at 881.  Here, the free exercise claim is coupled with the right to assembly and speech.  Plaintiffs cannot be involved in their religious communities or exercise their faiths without violating the challenged provision.

[15]    "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi,* 508 U.S. at 531.

Because this law facially targets employment and volunteering at religious organizations, it is subject to strict scrutiny.  Even assuming that the Defendants could show a compelling interest, the statute lacks narrow tailoring.[16]  It targets every employee and volunteer at a church or other place of worship.  The law is not limited to positions that may have interactions with children, positions that involve one-on-one interactions, or positions that might otherwise have some arguable connection to preventing sex offenses.  Even entirely solitary volunteer positions, such as writing for the church newsletter, are prohibited.  The ban applies to all people on the registry, even those who do not pose a danger.  The church employment/volunteer provision is not narrowly tailored.

The church employment/volunteer provision also interferes with core church decision-making for religious positions in violation of the ministerial exception grounded in the Free Exercise Clause.[17]  This too illustrates its lack of

---

[16]    *See generally Open Homes Fellowship, Inc. v. Orange County, Fla.,* 325 F.Supp. 2d 1349 (M.D. Fla. 2004) (finding that zoning restrictions on religiously based ministry for "substance-addicted" persons, including some sex offenders, was unconstitutional under rational basis review because there was an insufficient showing of "threat to safety").

[17]    As this Court noted, the "ministerial exception" refers to the rule adopted by several circuits that statutes that interfere with church employment relationships may violate the free exercise clause. *See* Order of 3/30/07 at 36.

narrow tailoring and overbreadth.

This Court correctly noted that the ministerial exception is not typically used to "invalidate a state statute."[18]  Normally, the exception applies to anti-discrimination laws, such as Title VII, whose enforcement may interfere with protected religious decision-making in employment.[19]  But the doctrine applies equally well here.  Indeed, the interference with religious decision-making here is even more broad.  The statute limits *all* religious institutions' hiring practices, not simply those of one church in a single case questioning an individual employment decision by that church.  Moreover, the application of the doctrine in this instance does not involve the sometimes dicey prospect of creating a judicial exception to a legislatively enacted anti-discrimination law.  This is a rare, quite possibly unique, circumstance where a state statute on its face *prevents* a religious institution from employing or using volunteers of its choosing.  It is thus an easier case for applying the ministerial doctrine.

---

[18]    *See* Order of 3/30/07 at 36.

[19]    Title VII specifically sanctions religious organizations to employ persons of their own faith.  42 U.S.C. § 2000e-1(g)(2004); *Id.* § 2000e-2(e).  Thus, Georgia's law prevents religious institutions from hiring sex offenders even though federal law protects such institutions' hiring decisions.

The church employment/volunteer provision strikes at the very heart of the ministerial exception's reason for being.  The ministerial exception "continues a long-standing tradition that churches are to be free from government interference in matters of church governance and administration."  *See Gellington v. Christian Methodist Church, Inc.*, 203 F.3d 1299, 1303-04 (11th Cir. 2000); *Bollard v. Cal. Providence*, 196 F.3d 940, 946 (9th Cir. 1999) (First Amendment protects "ecclesiastical self-governance with which the state may not constitutionally interfere"); *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006) (stating that the Free Exercise Clause protects a "church's right to decide matters of governance and internal organization"). The courts carved out this free-exercise grounded exemption to avoid government entanglement and undue government interference with church decisions and doctrine.

The ministerial exception forbids the government from intruding in church employment decisions when the employee's "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship. . . ." *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) (internal quotation marks and citation omitted); *see also McClure v. Salvation Army*, 460 F.2d 553, 558, 560 (5th Cir. 1972) (finding that the Free Exercise Clause forbids the

government from encroaching into church decisions regarding employment
practices).  Among the positions covered by this free exercise protection are a
choir director, a director of music, the principal of a Catholic elementary school,
and the press secretary at a Catholic church.  *See Rweyemamu v. Cote,* 520 F.3d
198, 205-210 (2d Cir. 2008) (summarizing case law).

Georgia's church employment/volunteer provision intrudes upon each
and every religious position – paid or volunteer – that would otherwise be
protected from state interference by the Free Exercise Clause and the ministerial
exception.  *See Gellington*, 203 F.3d at 1304 ("Investigation by a government entity
into a church's employment of its clergy would almost always entail excessive
government entanglement into the internal management of the church.").

Under the church employment/volunteer provision, a church cannot hire
anyone on the sex offender registry – even if he or she is on the registry for
consensual teenage sex committed years ago.  This is unconstitutional; the
legislature cannot inject itself into such "substantive ecclesiastical matters."
*McClure*, 460 F.2d at 560; *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 107 (1952)
("Legislation that regulates church administration, the operation of the churches,
[or] the appointment of clergy . . . prohibits the free exercise of religion.").

The church employment/volunteer provision, barring a person on the sex offender registry from volunteering or working within a church, is not neutral or generally applicable, directly targets religious decisions and duties and cannot survive strict scrutiny. Furthermore, it intrudes into the hiring of employees and soliciting of volunteers by a church. Accordingly, the provision violates the Free Exercise Clause.

B.    **The Church Employment/Volunteer Provision is Overbroad**

For much the same reason that the church employment/volunteer provision is not narrowly tailored, it is also unconstitutionally overbroad. A statute is overbroad "if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford,* 408 U.S. 104, 114 (1972). The overbreadth doctrine is an exception to the general rule of standing, permitting a litigant as to whom the statute may be constitutionally applied to challenge the statute so long as it could be applied in a manner that violates the First Amendment rights of others. *See Broadrick v. Okla.,* 413 U.S. 601, 610-12 (1973); *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798 (1984). Facial challenge of a statute as overbroad is a mechanism for "prevent[ing] the statute from chilling the First Amendment rights ...." *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 958 (1984). Thus, given that this case involves a certified class, the

named Plaintiffs can assert the religious freedom rights of others who seek to
work for or volunteer with religious institutions who welcome their membership
and participation.  Given the scope of the restrictions, the overbreadth is
substantial, barring all volunteer and employment positions. These include those
for which the government interest of limiting recidivism is actually frustrated by
robbing sex offenders of important faith recovery networks.

C.      **The Church Employment/Volunteer Provision is Unduly Vague**

The vagueness doctrine of the Due Process Clause of the Fourteenth
Amendment demands that a law be clear to police and citizens.  A law is
unconstitutional if it: (1) "fail[s] to provide the kind of notice that will enable
ordinary people to understand what conduct it prohibits" or (2) "authorize[s]
and even encourage[s] arbitrary and discriminatory enforcement."  *City of
Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Nat'l Endowment for the Arts v. Finely*, 524
U.S. 569, 588 (1998) ("The terms of the provision are undeniably opaque, and if
they appeared in a criminal statute or regulatory scheme, they could raise
substantial vagueness concerns.").

SB 1 provides no definition of what constitutes volunteering at a place of
worship.  *Compare Karriem v. Barry*, 743 F.2d 30 (D.C. Cir. 1984) (exploring
vagueness challenge to term "volunteer" and definition thereof contained in

20

Volunteer Service Act which limited ministers' access to jail).  What if a person on the registry is asked to give a reading, asked to provide a dish for a pot luck, pass the collection plate, or decorate a Christmas tree?  The lack of a definition in the statute leads people on the sex offender registry to either avoid going to church entirely, or avoid the very activities that their faith commands of them. Given the wide range of activities one may perform at a church, the lack of statutory definition as to which activities are prohibited, and the harsh criminal sanctions leveled simply for exercising one's religious freedom, this Court should strike the volunteer/employment provision of § 42-1-15.

## II.    THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT ISSUED.

The second factor for the Court to determine is whether the Plaintiffs will suffer irreparable harm absent a preliminary injunction.  The answer is simple: "The loss of First amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).

## III.    GRANTING THE INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO OTHERS.

Granting an injunction will not harm others.  An injunction will simply preserve the status quo.  Georgia has never before had a law prohibiting people on the registry from volunteering at church.  No other state has such a law. Moreover, the prohibition is needlessly duplicative, since sex offenders are already prohibited from loitering at or within 1,000 feet of anywhere minors congregate, and offenders on probation or parole are prohibited from any unsupervised contact with minors.  Finally, religious institutions have other tools to protect children.[20]

## IV.    ENJOINING THE STATUTE IS IN THE PUBLIC INTEREST.

Allowing Plaintiffs Collins, Coffey, Norton, Boone, Howard and others to continue to participate in their faith communities will further public safety by providing support, stability, and a grounded sense of right and wrong.  Both the Board of Pardons and Paroles and the Georgia Department of Corrections ("GDC") recognize that encouraging people to be involved with faith-based programs will reduce recidivism.  The Board of Pardons and Paroles and GDC started a Faith Based Community Initiative that partners churches with offenders

---

[20]    *See* Declaration of Rev. Rose (Exhibit 7, p. 2).

to reduce recidivism.[21]  Decades of criminological research identifies social

support, stability, and employment as factors that decrease recidivism.[22]

Moreover, the protection of free speech and religious rights is always in

the public interest.  The targeted injunction here only addresses those portions of

the statute that restrict core religious freedoms, drive people on the registry from

the church, and deprive them of the rehabilitative influence of their faith

communities.

Respectfully submitted this 24th day of June, 2008.

<u>s/ Sarah Geraghty</u>

SOUTHERN CENTER
FOR HUMAN RIGHTS
Stephen B. Bright
(Ga. Bar No. 082075)

---

[21]  The Faith-Based Partnership is "an initiative by the Georgia Department of
Corrections to broaden the role of religious groups in the rehabilitation of
offenders."  According to GDC Commissioner, James Donald, "Partnering with
the dedicated volunteers of the faith community provides a great opportunity to
assist inmates in redeeming themselves back into society.  I believe this initiative
will produce a safer Georgia as fewer inmates return to a life of crime as a result
of this partnership."  (Exhibit 8).

[22]  *See* Kruttschnitt, Uggen, & Shelton, *Predictors of Desistance Among Sex
Offenders*, JUSTICE QUARTERLY 17:61-87 (2000) (sex offenders with stable
employment and social relationships have lower recidivism rates); COLO. DEP'T
OF PUB. SAFETY, REPORT ON SAFETY ISSUES RAISED BY LIVING ARRANGEMENTS FOR
AND LOCATION OF SEX OFFENDERS IN THE COMMUNITY 4 (2004) (sex offenders with
positive support systems are less likely to re-offend and violate probation).

Lisa Kung
(Georgia Bar No. 430302)
Sarah Geraghty
(Georgia Bar No. 291393)
Gerald R. Weber
(Georgia Bar No. 744878)
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia  30303-2122
Telephone: (404) 688-1202
Fax: (404) 688-9440
sbright@schr.org
lkung@schr.org
sgeraghty@schr.org
gweber@schr.org

*Attorneys for the Plaintiffs*

## CERTIFICATION OF COMPLIANCE WITH L.R. 5.1B

Pursuant to L.R. 7.1, I, Sarah Geraghty, hereby certify that this motion has been prepared in compliance with Local Rule 5.1B.

Dated this 24th day of June, 2008.

**s/ Sarah Geraghty**

Sarah Geraghty
(Ga. Bar No. 291393)
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia  30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440
sgeraghty@schr.org

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served the foregoing *Brief in Support of Motion for Preliminary Injunction* upon Defendants by causing a true and correct copy thereof to be delivered by the Court's ECF filing system to Defendants' counsel of record at the following addresses:

Mr. Joseph Drolet
Ms. Devon Orland
Office of the Attorney General
40 Capitol Square
Atlanta, GA 30334

Mr. David E. Hudson
Hull, Towill, Norman, Barrett & Salley, PC
P.O. Box 1564
Augusta, GA 30903-1564

This 24th day of June, 2008.

**s/Sarah Geraghty**
Sarah Geraghty
(Ga. Bar No. 291393)
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440

*Attorney for the Plaintiffs*