## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

_____

)
WENDY WHITAKER, et. al.                      )
                                             )
    Plaintiffs,                          )
                                             )    CIVIL ACTION
v.                                           )
                                             )    No. 4:06-cv-140-CC
SONNY PERDUE, et. al.,                       )
                                             )
    Defendants.                          )
_____ )

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION TO ENJOIN ENFORCEMENT OF THE "SCHOOL BUS STOP" PROVISION OF O.C.G.A. § 42-1-15(B)

This case presents the question of whether persons on the sex offender registry – including children, the elderly, and persons with disabilities – may be forcibly evicted from their homes and communities every time a local school board designates a school bus stop pursuant to O.C.G.A. § 42-1-15(b). The material facts are not in dispute. Once a school board designates a school bus stop, any registered sex offender who knowingly resides within 1,000 feet of the school bus stop is instantly in violation of O.C.G.A. § 42-1-15(b) and subject to 10 to 30 years in prison. Thousands of school bus stops have been designated in Bulloch, Chatham, and Columbia counties, and nearly 400 people in those

counties stand to be evicted if this Court does not act.[1]  There is no dispute that, pursuant to § 42-1-15(b), school boards may change designated bus stops at any time, subjecting plaintiffs to recurring evictions.  There is further no dispute that if the school board in Fulton County designates its school bus stops pursuant to § 42-1-15(b), at least 900 people will have to move.[2]  Finally, there is no dispute that Georgia is the only state that prohibits all sex offenders – no matter how old, decrepit, or physically incapacitated – from residing within 1,000 feet of school bus stops for life.  The only disputed questions are legal ones – whether the school bus stop provision violates the *ex post facto* and substantive due process clauses.  Plaintiffs in the "school bus stop" subclass ask this Court to grant them summary judgment and to enjoin defendants from expelling them from their homes pursuant to the school bus stop provision of O.C.G.A. § 42-1-15(b). [3]

---

[1]      <u>See</u> Maps of Chatham, Columbia counties (Ex. 1, 2) (showing the broad scope of the school bus stop provision); Peter Wagner Decl. (Ex. 3).

[2]      <u>See</u> Depo. of Ahmed Holt, Ga. Dep't of Corr., Manager of Sex Offender Admin., June 2, 2009 at 16-17 (Ex. 4) ("[f]rom my last numbers, roughly 900 will have to move . . . .").

[3]      The subclass consists of persons who: "are registered, are required to register, or in the future will be required to register as sex offenders pursuant to O.C.G.A. § 42-1-15 who (1) reside in counties in which the school board has designated school bus stops for purposes of O.C.G.A. § 42-1-15; and (2) either do not own their homes or do not fall within the homeowner exemption of O.C.G.A.

STATEMENT OF FACTS

Per L.R. 56.1(B), the facts are set forth in *Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment and for a Permanent Injunction to Enjoin Enforcement of the "School Bus Stop" Provision of O.C.G.A. § 42-1-15(b).*

STANDARD OF REVIEW

Summary judgment may be granted if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.[4]

LEGAL ARGUMENT

I.    THE SCHOOL BUS STOP PROVISION IMPOSES RETROACTIVE PUNISHMENT IN VIOLATION OF THE *EX POST FACTO* CLAUSE.

The *ex post facto* clause prohibits "[e]very law that aggravates a crime, or makes it greater than it was, when committed" and "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Rogers v. Tennessee, 532 U.S. 451, 456 (2001) (quoting Calder v. Bull, 3 Dall. 386, 390 (1798)). See also Smith v. Doe, 538 U.S. 84, 92 (2003). The State has argued that the school bus stop provision is a non-punitive,

---

§ 42-1-15(f), (g) as determined by the sheriff in the county where the person is registered." Order of Mar. 30, 2009 [Doc. No. 223] at 17-18.

[4]    See Fed. R. Civ. P. 56(c).

regulatory "inconvenience."[5]  This Court previously "disagree[d]" with

defendants, finding that plaintiffs stated an *ex post facto* claim:

> While the Court recognizes that residency restrictions have been upheld in other cases, the Act at issue in the instant case imposes more severe residency restrictions than those evaluated in those opinions.[6]

Since this action was filed, numerous courts have found that sex offender

residence laws – including a New Jersey ordinance that prohibited sex offenders

from residing in proximity to school bus stops – violated the *ex post facto* clause.[7]

---

[5]      See Br. in Supp. of Defs.' Mot. to Dismiss, July 7, 2006 [Doc. No. 32] at 18.

[6]      Order of Mar. 30, 2007 [Doc. No. 109] at 15.

[7]      See Elwell v. Township of Lower, 2006 WL 3797974 at *17 (N.J. Super. Ct. Law Div. Dec. 22, 2006) (ordinance prohibiting sex offenders from residing within 25 feet of school bus stop violated *ex post facto* clause).  See also State v. Pollard, 908 N.E.2d 1145, 1150, 1154 (Ind. 2009) (Indiana statute prohibiting sex offenders from living within 1,000 feet of a school, youth center, or park violated *ex post facto* clause since it rendered persons "subject to constant eviction"); Commonwealth v. Cory, 911 N.E.2d 187 (Mass. 2009) (retroactive application of statute requiring probationers convicted of sex offenses to be placed on global positioning system device violated *ex post facto* clause); *Order Granting Permanent Inj.*, Oct. 7, 2008 [Doc. No. 77], ACLU of Nevada, Does 1-8, v. Masto, Case No. 2:08-cv-922 (D. Nev. 2008) (statute that re-categorized sex offenders and made them retroactively subject to residence law, including school bus stop provision, N.R.S. § 213.1243, violated *ex post facto* clause) (cited in U.S. v. Burkey, 2009 WL 1616564 at *8 (D. Nev. June 8, 2009); Mikaloff v. Walsh, 2007 WL 2572268 at *3 (N.D. Ohio Sept. 4, 2007) (Ohio law prohibiting sex offenders from residing within 1,000 feet of a school violated the *ex post facto* clause because it "restricts where offenders can live in a manner similar to probation and parole, prototypical punishments"); R.L. v. Mo. Dep't of Corr., 245 S.W.3d 236 (Mo.

This Court's March 2007 *ex post facto* analysis was correct and should be adopted on summary judgment.

### A.   *Ex post facto* standard.

A statute violates the *ex post facto* clause if its intent is to impose retroactive punishment, or if it is so punitive in effect as to negate the state's attempt to deem it a civil regulation.  See <u>Smith v. Doe</u>, 538 U.S. 84, 92 (2003).

### B.   The Intent of the School Bus Stop Provision Was Punitive.

The legislative intent behind the Statute was to banish sex offenders from Georgia.  Representative Jerry Keen, the Statute's chief sponsor, unambiguously stated as much during the Statute's legislative vetting process:

- "There is no place in our society for those who prey on innocent children."[8]

- "We don't want these types of people staying in our state."[9]

_____

2008) (a 1,000-foot sex offender residence statute was a retroactive law in violation of state constitution).  <u>See also</u> <u>Doe v. Schwartzenegger</u>, 476 F. Supp.2d 1178, 1181 (E.D. Cal. 2007) (applying sex offender residency law retroactively "would raise serious ex post facto concerns.").

[8]      Press Release, Georgia House of Representatives, *Majority Leader Urges House to Consider Tougher Laws for Sexual Predators* (Sept. 28, 2005), *available at* http://www.legis.ga.gov/legis/2005_06/house/ communications/Press/tougherLawsSexual.htm (quoting Rep. Keen).

[9]      Greg Bluestein, *House Leaders Lobby for Tougher Sex Offender Penalties*, MACON TELEGRAPH, Jan. 13, 2006 (quoting Rep. Keen).

- "We want those people running away from Georgia.  Given the toughest laws here, we think a lot of people could move to another state."[10]

- "If someone did something now to my grandchildren, I think you and I would have the same reaction to that. Those are the people we're targeting. Those are the people we're trying to get off the streets of this state, and those are the people that we are going to send a message to that if you have a propensity to that crime perhaps you need to move to another state."[11]

- "If it becomes too onerous and too inconvenient, they just may want to live somewhere else. . . .And I don't care where, as long as it's not in Georgia."[12]

- "Candidly, Senators, they will in many cases have to move to another state."[13]

Additional evidence, including the manner of codification of the Statute

and its established enforcement procedures, weighs in favor of finding punitive

intent.  See Smith, 538 U.S. at 94.  First, O.C.G.A. § 42-1-15 is codified in Title 42

---

[10]     Emily Kopp, *Sensational Topics Set for Election-Year Session*, GEORGIA PUBLIC RADIO, Jan. 6, 2006.

[11]     Statement by Rep. Keen to Rep. Roger Bruce during House debate on HB 1059, Feb. 2, 2006, House Internet Broadcasts, http://www.georgia.gov/00/article/0,2086,4802_6107103_47120020,00.html.

[12]     Nancy Badertscher, *Law to Track Sex Offenders Studied*, ATLANTA J.-CONST., Aug. 16, 2005, at B1 (quoting Rep. Keen).

[13]     Editorial, *Sex Offenders Won't Vanish for Good*, ATLANTA J.-CONST., Mar. 23, 2006, at 14A ("[H]ouse Majority Leader Jerry Keen . . . told his Senate colleagues that he intends to drive sex offenders out of Georgia.")

of the Georgia Code, entitled "Penal Institutions."  Other matters addressed in Title 42 include: conditions of detention (§ 42-4-30); charges levied on inmates (§ 42-4-71); conditions of probation (§ 42-8-35), house arrest (§ 42-1-8), and work release for prisoners (§ 42-1-14).[14]  Second, the Statute mandates a criminal sanction – 10 to 30 years in prison – for failure to comply.  The United States District Court for the Northern District of Ohio found that Ohio's sex offender residence law was intended to be punitive on a record similar to this case.[15]

In sum, the expressed intent of key members of the Legislature in enacting the Statute was to banish a whole class of people.[16]  The State's suggestion that the purpose of the Statute was to impose a mere regulatory "inconvenience" is undermined by the very words of the Statute's authors: "We don't want these types of people staying in our state."[17]

---

[14]    Cf. Kansas v. Hendricks, 521 U.S. 346, 361 (1997) (the fact that Kansas Sexually Violent Predator Act was placed in probate code rather than criminal code evinced a legislative intent to create a civil proceeding).

[15]    See Mikaloff v. Walsh, 2007 WL 2572268 at *5 (N.D. Ohio Sept. 4, 2007) ("The Ohio General Assembly's failure to identify the residency restrictions . . . as civil and its decision to include the provision in its criminal chapter gives some suggestion that the residency restriction was intended to be punitive.").

[16]    See supra p. 5-6.

[17]    See supra n. 9.

**C.      The Effect of the School Bus Stop Provision Is Punitive.**

Regardless of legislative intent, the *effect* of the school bus stop provision is to sentence plaintiffs to a life of transience, forcing them to move from place to place depending on the whim of local school boards, which are free to designate school bus stops anywhere at anytime.  The school bus stop provision is "punitive" when analyzed pursuant to the factors in <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 168-169 (1963) and <u>Smith v. Doe</u>, 538 U.S. 84, 97 (2003): (1) whether the statute "has been regarded in our history and traditions as punishment;" (2) whether it "imposes an affirmative disability or restraint;" (3) whether it "promotes the traditional aims of punishment;" (4) whether it "has a rational connection to a nonpunitive purpose;" and (5) whether it "is excessive with respect to this purpose."  <u>Id.</u>

**1.      The School Bus Stop Provision is Analogous to Sanctions That Have Been Historically Considered Punishment: Banishment and the Residence Restrictions Typical to Probation and Parole.**

The school bus stop provision is analogous to two traditional punishments: banishment and the residence restrictions typical of probation and parole sentences.

Banishment has historically been considered "punishment."[18]  Courts in Georgia regularly impose banishment – often from a particular county or judicial circuit – as a punishment for crimes.[19]

Defendants have argued that the school bus stop provision is not similar to banishment because it does not permanently expel persons from communities.[20] But plaintiffs are not required to show that the Statute is equivalent to total banishment from a jurisdiction.[21]  To satisfy the first Mendoza-Martinez standard, rather, plaintiffs need only show that the Statute's effects resemble banishment.[22]  This Court, moreover, previously held that it could conclude,

---

[18]     See Nixon v. Admin. of Gen. Svs., 433 U.S. 425, 474 (1977) ("'pains and penalties' historically" comprising punishment "commonly included . . . imprisonment, banishment, and the punitive confiscation of property by the sovereign").

[19]     See, e.g., Adams v. State, 2009 WL 1459571 (Ga. Ct. App. May 27, 2009) (upholding sentence of banishment from Putnam County); Wyche v. State, 197 397 S.E.2d 738 (1990) (reviewing sentence of banishment from five county area).

[20]     See e.g. Defs' Mot. to Dismiss [Doc. No. 55-2] at 2.

[21]     See Doe v. Baker, 2006 WL 905368 at *4 (N.D. Ga. April 6, 2006) (A law that would "make it impossible for a registered sex offender to live in the community would in all likelihood constitute banishment which would result in an ex post facto problem if applied retroactively to those convicted prior to its passage.").

[22]     See Consol. Edison Co. of New York v. Pataki, 292 F.3d 338, 351 (2d Cir. 2002) ("A statute need not fit within the historical category of punishment to be

when presented with evidence regarding the availability of housing and the

areas impacted by the Statute, that the Statute "sufficiently resembles

banishment to make this factor weigh towards finding the law punitive."[23]  This

Court stated:

> The Court agrees . . . . that a statute found to be substantially similar to
> banishment could support a finding of punitive effect. In this case,
> Plaintiffs may be able to establish that they are effectively excluded from
> many communities in Georgia by operation of the Act.  If the Court
> required Plaintiffs to prove banishment as historically defined in order to
> pursue an *ex post facto* challenge, the Georgia legislature could prohibit sex
> offenders from living anywhere in the State of Georgia without raising a
> question of punitive effect relevant to an *ex post facto* determination. This
> position goes too far. The Act may be found to sufficiently resemble
> banishment so as to support a finding that it is punitive in effect.[24]

Plaintiffs have now presented this Court with such evidence; the Statute is

so expansive that nearly 400 people stand to be evicted from "bus stop counties"

---

considered such.  Such a rule would render the Clause[] unable to respond to
attempts by contemporary legislatures to punish individuals in new and
heretofore unforeseen ways.") (citing Nixon, 433 U.S. at 475).  See also People v.
Leroy, 828 N.E.2d 769, 787 (Ill. App. Ct. 2005) (Kuehn, J., dissenting) ("[W]hat
happened to [Plaintiff] resembles how people used to be punished in colonial
times.  Our inquiry into whether the retroactive residency restriction imposed by
this law violates constitutional *ex post facto* constraints should progress from a
finding that the restriction imposed resembles a historical form, and a traditional
means, of punishment.").

[23]     See Order, Mar. 20, 2007 [Doc. No. 109] at 19.

[24]     See id.

absent a ruling in plaintiffs' favor.[25]  The number will likely grow exponentially

as other school boards designate school bus stops to prevent influxes of sex

offenders expelled from other counties.[26]

 In addition to banishment, the school bus stop provision is akin to the

traditional punishments of probation and parole.  In Georgia, sentencing courts

may order probationers to reside in certain locations,[27] and parole officers

determine where parolees can live.[28]  In the same way, the school bus stop

provision places a "veto-power" over the location of plaintiffs' residences in the

hands of local school boards.  <u>Mikaloff</u>, 2007 WL 2572268 at *9-10 (finding that

residence law was akin to restrictions imposed by parole officers since non-

compliance with both types of restrictions trigger criminal sanctions); <u>Pollard</u>,

---

[25] <u>See</u> *Statement of Material Facts* ¶ 23-25; Maps (Ex. 1, 2).

[26] Discovery revealed that a relatively small number of plaintiffs – 134 of
more than 17,000 – are exempt under the homeowner exemption of § 42-1-15(f).
<u>See</u> Mica Doctoroff Decl. (Ex. 9 ¶ 14).

[27] <u>See</u> O.C.G.A. § 42-8-35(6) (permitting courts to order a probationer to
"[r]emain within a specified location").

[28] <u>See</u> Ga. State Bd. of Pardons and Parole, Field Op. Div., Trans. Housing for
Offender Reentry Directory, Mar. 17, 2009 at 3 (stating "[Parole board] personnel
make the final decision on an offender's residence plan.") (Ex. 18); Testimony of
Richard Oleson, Ga. Bd. of Pardons and Paroles, Trans. of Prelim. Inj. Hearing,
July 12, 2006 [Doc. No. 43] at 306 ("parole [officers] have the authority to go
beyond the definition of the statute in requiring where people live").

908 N.E.2d at 1151 (finding that "restrictions on living in certain areas is not an uncommon condition of probation or parole" and determining that residence restrictions were analogous to traditional punishments).[29]  Moreover, while parole/probation laws empower the state to approve an offender's residence on a case-by-case basis for a limited time, the school bus stop provision broadly forbids all plaintiffs from residing within 1,000 feet of school bus stops for their entire lives.[30]  The Statute, therefore, resembles the traditional punishments of banishment and probation/parole.  This factor weighs in plaintiffs' favor.

## 2.    The Statute Imposes An Affirmative Disability or Restraint.

When determining whether a law subjects persons to "an affirmative disability or restraint," the reviewing court inquires "how the effects of the Act are felt by those subject to it." Smith, 538 U.S. at 99-100.  "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." Id. at 100. This Court previously held that in the instant case, unlike Smith, the school bus stop provision "imposes a physical restraint on the available residences of

---

[29]    See Smith, 538 U.S. at 115-116 (Ginsburg, J., dissenting) (sex offender registration law was "comparable to conditions of supervised release or parole").

[30]    See Mikaloff, 2007 WL 2572268 at *9-10 (residency restriction is "analogous to" probation and parole, but even "more onerous").

registered sex offenders."[31]  Moreover, as this Court recognized:

> school bus stops are inherently transient and may be designated by local school boards of education at any time under the Act, significantly limiting the permanency of residences that can be established by registered sex offenders and impairing their ability to form relationships in their chosen communities.[32]

Given that the school bus stop provision subjects plaintiffs to recurring evictions for life, it is not a "minor and indirect effect of a conviction for a sexual offense."[33]  The second factor weighs in plaintiffs' favor.

### 3.    The Statute Promotes the Traditional Aims of Punishment.

"The parties do not dispute that one of the purposes of the Act is deterrence, a traditional aim of punishment."[34]  As this Court held, this factor weighs in plaintiffs' favor.[35]

---

[31]    See Order, Mar. 30, 2007 at 19-20; Doe v. Miller, 405 F.3d 700, 721 (8th Cir. 2005) (statute imposed affirmative disability); Mikaloff, 2007 WL 2572268 at *8 (residence restriction "imposes an onerous affirmative disability and restraint"); Pollard, 908 N.E.2d at 1150 (residence restriction subjected persons to "constant eviction," thus imposing affirmative disability).

[32]    Order, Mar. 30, 2007 [Doc. No. 109] at 20.

[33]    See id.

[34]    See id.

[35]    See id.

### 4.    The School Bus Stop Provision Is Irrational and Excessive.

The fourth factor is whether the Statute has a rational connection to a non-punitive purpose and whether it is excessive as to that purpose.  See Smith, 538 U.S. at 102.  The bus stop provision is irrational and excessive for three reasons.

First, the Statute fails to differentiate between people on the sex offender registry and instead treats everyone the same, regardless of whether the person engaged in teenage consensual sex or a violent offense.[36]  Wendy Whitaker, who is on the registry for engaging in consensual oral sex at age 17 with a 15-year-old, is subject to the school bus stop provision, even though the sheriff's deputy tasked with her supervision does not believe she should even be required to register as a sex offender.[37]  See Pollard, 908 N.E.2d at 1153 (statute was excessive where it "applie[d] equally to persons convicted for example of vicarious sexual gratification as a class D felony  . . . as to persons convicted of rape as a class A felony. . . ."); Cory, 911 N.E.2d at 197 (statute retroactively requiring sex

---

[36]    This Court held that "the Act's failure to distinguish among sex offenders and failure to identify those registered sex offenders who are most likely to reoffend, when coupled with the fact that the instability created by the Act may be harmful to the public, could support a finding that the Act is excessive." Order, Mar. 30, 2007 [Doc. No 109] at 21.

[37]    See Depo. of Inv. David Rush, Columbia County Sheriff's Office, June 22, 2009 at 30 (Ex. 19) ("[I] think Ms. Whitaker shouldn't be on the registry.").

14

offenders to wear GPS devices was excessive "to the extent that it applies

without exception . . . regardless of any individualized determination of their

dangerousness or risk of reoffense.").[38]

Second, the school bus stop provision will not prevent sex offenses.[39]  In

fact, the contrary is true: sex offenders with stable housing are less likely to

commit new sex offenses than those who lack such stability.[40]  An analysis of

---

[38]   Cf. Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1017 (8th Cir. 2006)
(the "particularized risk assessment of sex offenders" under Arkansas law
"increases the likelihood that the residency restriction is not excessive in relation
to the rational purpose of minimizing the risk of sex crimes against minors").

[39]   See Jill S. Levenson & Leo P. Cotter, The Impact of Sex Offender Residence
Restrictions: 1,000 Feet from Danger or One Step from Absurd?, 49 INT'L J. OFFENDER
THERAPY & COMP. CRIMINOLOGY 168 (2005) (suggesting that residence restrictions
disrupt stability and lead to an increase in risk factors associated with sex offense
recidivism); COLO. DEP'T OF PUB. SAFETY, REPORT ON SAFETY ISSUES RAISED BY
LIVING ARRANGEMENTS FOR AND LOCATION OF SEX OFFENDERS IN THE COMMUNITY
4 (2004) ("Placing restrictions on the location of . . . supervised sex offender
residences may not deter the sex offender from re-offending and should not be
considered as a method to control sexual offending recidivism"); MINN. DEP'T OF
CORR., LEVEL THREE SEX OFFENDERS RESIDENTIAL PLACEMENT ISSUES: 2003 REPORT
TO THE LEGISLATURE 9 (2003) ("Enhanced safety due to proximity restrictions may
be a comfort factor for the general public, but it does not have any basis in fact.").

[40]   See id.  See also Wendy Koch, Sex-Offender Residency Laws Get Second Look:
States Consider Easing Restrictions that Critics Say Provide a False Sense of Security
and Often Make Felons Tougher to Monitor, USA TODAY, Feb. 26, 2007, at 1A
(describing a "backlash" against sex offender residence restriction laws).

Georgia's parolees verified the importance of stable housing.[41]  Most relevant to

this case, this 2003 study found that among Georgia parolees, residential

instability has a serious impact on recidivism, quantifiable as a 25% increase in

the likelihood of arrest <u>each time</u> a parolee changes addresses.[42]  Further, training

materials disseminated by the Board of Pardons and Paroles in 2008 list "lifestyle

instability" as "one of the most powerful triggers to committing a sex offense."[43]

For this reason and others, law enforcement officials and experts in the

prevention of sex abuse have called for a change in Georgia's sex offender law:

- **Investigator David Rush of the Columbia County Sheriff's Office** stated in his deposition: "[i]t's my opinion that the school bus stop [provision] should not be a part of a sex offender law" because it would "almost be impossible . . . to enforce" and because of "fears" that "offenders go underground."[44]

---

[41]     <u>See</u> Applied Research Serv., <u>Enhancing Parole Decision-making Through the Automation of Risk Assessment</u> 15 (Apr. 2003) (Ex. 23).

[42]     <u>See</u> <u>id.</u>

[43]     <u>See</u> Ga. Bd. of Pardons and Paroles, *Basic Parole Officer Training, Sex Offender Supervision,* Oct. 8, 2008 at 5 (Ex. 20).  The training materials further state: "<u>Financial, employment, and residence stability lower stress levels and increase a person's self worth.  Lowering or losing any of these increases stress, which in turn increases risk</u>." (emphasis added).

[44]     <u>See</u> David Rush Depo., June 22, 3009 at 51 (Ex. 19).

- **Sheriff McGuffey of Coweta County** stated that if sex offenders are constantly being forced to move, "they're more apt to go underground and hide."[45]

- **Sheriff Jolley of Harris County** stated in a declaration to this Court: "[a] sex offender registry should keep track of people, which will be much more difficult to do if [the school bus stop] provision goes into effect."[46]

- **Sheriff Brown of DeKalb County** stated at a news conference in June 2006: "There is not one place in DeKalb County where any sexual offender can live.  Not one . . . .Where are the 490 offenders going to go?  I have no earthly idea."[47]

- **Sheriff McDuffie of Chatham County** advocated different sex offender restrictions based upon the severity of the crime.[48]

- **Former DeKalb County District Attorney, J. Tom Morgan,** authored an editorial criticizing the sex offender residence law: "Georgia's sex offender registry law is irreparably flawed . . . . It provides a false sense of security for citizens while unreasonably and irrationally depriving individuals of fundamental rights."[49]

---

[45]     Sarah Campbell, *Sex Law Change No Major Concern*, TIMES-HERALD, Nov. 25, 2007.

[46]     Decl. of Mike Jolley, July 10, 2006 [Ex. 2 to Doc. No. 37] at 2.

[47]     Chandler Brown, *Sheriff: New Sex Offender Law 'Nearly Impossible to Enforce,'* ATLANTA J.-CONST., June 23, 2006.

[48]     *Reversal of Sex Offender Law Frees Shelter to Serve*, SAVANNAH MORNING NEWS, Nov. 28, 2007.

[49]     J. Tom Morgan, *Law Weakens Rights, Offers Little Security*, ATLANTA J.-CONST., Aug. 22, 2006.

- **Lt. Wanda Edwards of the Lowndes County Sheriff's Department**
  predicted that Ga. Code Ann. § 42-1-15 would cause people to abscond,
  and stated "what people don't realize is that the public will be in more
  danger if the new provisions are upheld and must be enforced."[50]

Experts in the prevention of sexual abuse, including Dr. Kevin Baldwin,

share concerns about the Statute.[51]  At the July 12, 2006 hearing in this case, Dr.

Baldwin testified that rather than furthering public safety, the school bus stop

provision "will in fact have the opposite effect of increasing potential harm to

children," and that O.C.G.A. § 42-1-15 runs directly contrary to accepted

strategies to reduce recidivism.[52]  Under questioning from this Court, the State's

expert witness agreed that the school bus stop provision had the "potential to

raise risk for recidivism."[53]

---

[50]     Kelly Hernandez, *Will New Sex Offender Law Help or Hurt?* VALDOSTA
DAILY TIMES, July 13, 2006.

[51]     See Tr. of Hearing, July 11-12, 2006 [Doc. No. 42, 43] at 203-211.  Dr.
Baldwin has nearly 20 years of experience in the evaluation of sex offenders, was
formerly employed by the North Carolina Department of Corrections, and
served on the panel of state experts who performed assessments of persons
considered sexually dangerous persons in that state.  See id. at 193-97.

[52]     Id. at 216.

[53]     See Testimony of Dr. Mario Dennis, Tr. of Hearing, July 12, 2006 at 338.

Georgia's Child Advocate,[54] moreover, recently stated in a letter to the Office of the Governor that "[t]here is no evidence that sex offender residence restrictions prevent sex crimes or increase public safety" and concluded that:

> [d]isrupting offenders' stability through exclusionary housing and employment provisions is likely to exacerbate the psychosocial stressors that can increase the likelihood of recidivism, thereby impeding the public safety goal that is at the very heart of SB 1.[55]

Third, as this Court noted, the 10 to 30 year penalty for violating the Statute is "particularly severe" and this "harsh sanction" supports a finding that the Statute is punitive.[56]  The fact that the Statute applies to plaintiffs for the remainder of their lives further weighs in favor of a finding of punitiveness.[57]

In conclusion, the school bus stop provision substantially increases the punishment for previously-committed crimes and is excessive in relation to its

---

[54]    The Office of the Child Advocate is tasked with ensuring the safety of at-risk children and families by serving as a reliable source of information on research and evidence-based practices and policies.  See http://gachildadvocate.org/00/channel_title/0,2094,84387339_84389355,00.html

[55]    See Letter to the Office of the Governor from the Child Advocate, Apr. 29, 2008 [Doc. No. 176, Attachment 3].

[56]    See Order, Mar. 30, 2007 [Doc. No. 109] at 21.

[57]    See O.C.G.A. § 42-1-12(f) ("Any sexual offender required to register under this Code section shall . . . (7) Continue to comply with the registration requirements . . . for the entire life of the sexual offender.")

purpose in violation of the *ex post facto* clause.  See <u>Mikaloff</u>, 2007 WL 2572268 at

*12 ("It is the function of the criminal laws of the state, and not residency

restrictions imposed after the sentence has been determined and fulfilled, to

punish those individuals for this conduct").  It must be held unconstitutional.

II.    **THE SCHOOL BUS STOP PROVISION VIOLATES THE
       SUBSTANTIVE COMPONENT OF THE DUE PROCESS CLAUSE,
       ESPECIALLY AS APPLIED TO CHILDREN, PERSONS
       CONVICTED OF SODOMY FOR CONSENSUAL SEXUAL ACTIVITY
       AS TEENAGERS, AND PERSONS IN NURSING HOMES.**

       **A.  The Freedom to Maintain One's Home and Family Without Being
       Subject to 10 to 30 Years Imprisonment Is a Protected Liberty
       Interest that the State Cannot Infringe Upon Absent a
       Countervailing Interest Sufficient to Justify Such a Massive
       Intrusion.**

       The Due Process Clause is a "bulwark[]…against arbitrary legislation."

<u>Hurtado v. California</u>, 110 U.S. 516, 532 (1884).  The liberty guaranteed by

substantive due process "includes a freedom from all substantial arbitrary

impositions and purposeless restraints," and "recognizes…that certain interests

require particularly careful scrutiny of the state needs asserted to justify their

abridgement." <u>Poe v. Ullman</u>, 367 U.S. 497, 543 (1961) (Harlan, J. dissenting).

Moving away from the traditional substantive due process analysis,[58] where grouping rights as "fundamental," or not, and applying strict scrutiny, or the rational basis test dictated the Due Process inquiry, the United States Supreme Court recently advanced a more nuanced analysis.  In 2003, the Court in <u>Lawrence v. Texas</u>, 539 U.S. 558, struck down the Texas sodomy statute as violative of substantive due process.  The Court did so without using either the strict scrutiny or rational basis test, holding instead that the statute "furthers no legitimate state interest which can <u>justify</u> its intrusion into the personal and private life of the individual." <u>Id</u>. at 578 (emphasis added).

One commentator on the <u>Lawrence</u> opinion noted:

> The structure of two rigid "tests," one deferential to the government (rational basis review) and one almost impossible for the government to meet (strict scrutiny), is slowly but surely giving way to a more sophisticated approach. That approach will generate an analysis that will likely take into account not just whether a right is basic, or, to use the old terminology, "fundamental," but how seriously the government is interfering with that right.[59]

---

[58]     In the classic due process analysis, government actions that interfere with "fundamental rights" protected by the Due Process Clause are subject to strict scrutiny, and will be upheld only if they are "necessary" to achieve a compelling interest and are "narrowly tailored" to that end.  <u>Roe v. Wade</u>, 410 U.S. 113 (1973).  Government actions implicating all other rights are subject to the rational basis test, and pass muster so long as they are rationally related to a legitimate state interest.  <u>See</u> <u>id.</u>

Whether using the traditional "fundamental rights" analysis or the newer, more nuanced due process analysis developing in the Supreme Court to scrutinize the school bus stop provision, the massive impact of the Statute is central to the inquiry. Plaintiffs conservatively estimate that the school bus stop provision, if permitted to go into effect, will force nearly 400 persons in Bulloch, Chatham, and Columbia counties from their homes, driving them away from spouses, children, or other family they do not wish to abandon.[60] Some, like Wendy Whitaker, will be suffering this loss for having engaged in consensual sex as a teenager. Enforcement will drive people who are disabled, bedridden and incapable of re-offending from nursing homes without a logical reason.

The school bus stop provision affects not only plaintiffs' homes, but also their family relationships. "The institution of the family is deeply rooted in this

---

[59]     Matthew Coles, _Lawrence v. Texas and the Refinement of Substantive Due Process_, 16 Stanford L. & Policy Rev. 23, 24 (2005). See also Laurence Tribe, _Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak its Name_, 117 Harv. L. Rev. 1893, 1899 (2004) (positing that in "rejecting the notion that its task was simply to name the specific activities textually or historically treated as protected," the Court in Lawrence "significantly altered the historical trajectory of substantive due process and thus of liberty."); Lingle v. Chevron, 544 U.S. 528, 542 (2005) (holding that state action infringing on property rights without substantially advancing a legitimate state interest is a substantive due process problem that "asks, in essence, whether [the government action] is effective in achieving some legitimate public purpose.").

[60]     See _Statement of Material Facts_ ¶¶ 23-25.

Nation's history and tradition," <u>Moore v. City of East Cleveland</u>, 431 U.S. 494, 503 (1977), and "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." <u>Cleveland Bd. of Educ. v. LaFleur</u>, 414 U.S. 632, 639-40 (1974). As the Court stated in <u>Moore</u>, "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." 431 U.S. at 499.

Because of the expansiveness of the Statute, spouses, parents, and children of people on the registry will be faced with the Hobson's choice of moving suddenly or being separated.[61] And any suggestion by defendants that families can simply "move together" is willfully blind to economic reality.[62] The Statute has caused and will continue to cause enormous upheaval and stress for plaintiffs' families. <u>See</u> <u>Elwell</u>, 2006 WL 3797974 at *15 (ordinance prohibiting

---

[61]    <u>See</u> Maps (Ex. 1, 2).

[62]    <u>See</u> <u>e.g.</u> Judy Lammers Decl., June 25, 2006 [Ex. 6 to Doc. No. 12] (stating that she relies on her son, a person on the registry, to live with her and describing economic hardship that would result from separation); Jeffrey Jones Decl., Jan. 29, 2008 [Ex. C to Doc. No. 169] (stating that the bank foreclosed on his home and that he lost $25,000 after sheriff's deputy ordered him to move from his home because it was within 1,000 feet of a school bus stop).

sex offenders from residing near bus stops "substantially intrude[d] upon

significant family matters," including "how to raise and care for children").[63]

Under traditional due process analysis, the impact on plaintiffs' families is

relevant because it shows an imposition on an enumerated fundamental right,

the fundamental right to cohabit with one's family, Roberts v. U.S. Jaycees, 468

U.S. 609, 619 (1984) (describing the life activities entitled to constitutional

protection as "those that attend the creation and sustenance of a family,"

including "cohabitation with one's relatives").  Under the Court's Lawrence

_____

[63]    See also Rebecca Danner Decl., Dec. 19, 2007 (Ex. 21) (stating that she and
her late husband, who died of cancer, were forced to move three times due to the
Statute; further stating that they were ordered to move a fourth time while her
husband was under hospice care); Thomas Early Decl., July 27, 2006 [Ex. 1 to
Doc. No. 63] (stating that school bus stop provision would separate him from his
wife who has multiple sclerosis); Kimberly Sponsler Decl., June 25, 2006 [Ex. 1 to
Doc. No. 12] (describing the stress and uncertainty wrought by the school bus
stop provision and its effect on family life as parent of 4-year-old and infant);
Adrienne Mauldin Decl., June 25, 2006 [Ex. 2 to Doc. No. 12] at 2-3 (describing
predicament of being expectant mother married to a person on the registry and
being faced with the possibility of separation from husband while 8 ½ months
pregnant; fearing that statute "will hinder us from raising our child in a stable
environment"); Kathleen Corbin Decl., June 25, 2006 [Ex. 4 to Doc. No. 12]
(describing emotional effects of possibility of separation from husband on
registry, with emphasis on hardship on special-needs child); Amy Whitaker
Decl., June 28, 2006 [Doc. No. 19-6] (expressing concerns about separation from
disabled father, for whom registrant was primary caregiver); Benjamin Hodges
Decl., Sept. 4, 2009 (Ex. 15 )(stating that he had two strokes, is paralyzed on one
side, is confined to wheelchair, relies on family for assistance, and resides within
1,000 feet of a school bus stop in Bulloch County).

approach, this Court must consider how the Statute affects plaintiffs' liberty

interest in maintaining their homes and families, and how deeply the Statute

infringes on those interests.  Either way, the question is whether the State's

interest can justify such an enormous infringement on plaintiffs' liberty interests.

States are permitted to infringe on basic liberty interests, but only "in

certain narrow circumstances."  Kansas v. Hendricks, 521 U.S. 346, 357 (1997)

(upholding statute permitting civil commitment of sexually dangerous persons,

but only where state provided a full-blown, individualized trial on the issue of

future dangerousness).[64]  The hallmark of a permissibly narrow infringement in

instances where the person's liberty is severely damaged is an individualized

assessment to ensure the State does not step beyond what is strictly necessary.[65]

---

[64]     Under the statute at issue in Hendricks, persons at risk of involuntary
commitment are entitled to: assistance of counsel; funds for a mental health
examination; the right to cross-examine witnesses; the right to review documents
at trial; and annual review to determine whether the state continues to meet its
burden to keep the individual confined.  Hendricks, 521 U.S. at 352-53, 357-58.
Upholding this statute against a substantive due process challenge, the Supreme
Court was apparently impressed by the pains taken by the State to ensure that it
was justified in committing a person under the statute.  See id.

[65]     See e.g. United States v. Loy, 237 F.3d 251, 269 (3d Cir. 2001) (a state may
not restrict a sex offenders' parental rights without first determining in an
individualized hearing that the parent's custody threatens the child's safety).

In <u>Sell v. United States</u>, 539 U.S. 166 (2003), eschewing any mention of "fundamental rights," the Court recognized that individuals have a "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs," and sought to determine whether the government's interest in having a criminal defendant competent to stand trial justified an infringement of the criminal defendant's liberty interest. <u>Id</u>. at 176. Because forced medication infringes so seriously on a person's liberty interest in bodily integrity, the Court established individualized assessment criteria to ensure that the government intrusion is justified. <u>Id</u>. at 180-181. The <u>Sell</u> Court's careful balancing of interests offers guidance to the present question of whether the State's interest in protecting children justifies enforcement of a law that summarily ousts people from their homes without any individualized determination of dangerousness:

> First, a court must find that *important* governmental interests are at stake…Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense…Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results…Fourth, as we have said, the court must conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition…

Id. at 180-81.  After balancing all factors, the Sell Court determined the state

interest in making Mr. Sell competent could not justify the intrusion on Mr. Sell's

interest in remaining free of forced medication.  Id. at 185-86.

Plaintiffs note that Georgia's sex offender law contains a process for a

Sexual Offender Registration Review Board to make determinations of whether a

person should be classified as a "sexually dangerous predator," and as such, be

subject to lifetime electronic monitoring.  See O.C.G.A. § 42-1-13.  The Board,

which includes professionals "knowledgeable in the field of the behavior and

treatment of sexual offenders," is charged with making individualized

determinations of dangerousness.  Id.  Before a person is labeled a "predator"

and made subject to electronic monitoring, he has a hearing.  See id.  As with

civil commitments and forced medication, compulsory electronic monitoring

requires at least an individualized assessment of the person's dangerousness,

and the opportunity to present evidence, in order to justify the government's

infringement on an individual's liberty interest to remain free of such

monitoring.  See Cory, 911 N.E.2d at 572.

Without commenting on the sufficiency of these procedures as applied to

electronic monitoring, plaintiffs contend that losing one's home and being driven

27

from one's community is at least as serious as the loss of liberty caused by electronic monitoring.  Yet plaintiffs stand to be summarily evicted the moment a school bus stop is designated within 1,000 feet of their homes without <u>any</u> assessment as to whether their residence in proximity to a school bus stop poses a risk.  Lacking a procedure to determine which individuals could legitimately be subject to the 1,000 foot buffer, the school bus stop provision "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual."  <u>Lawrence</u>, 539 U.S. at 578.

Finally, for the reasons set forth above, <u>see</u> <u>supra</u> § I(C)(4), due process prohibits enforcement of the school bus stop provision even under rational basis review.  Disabling plaintiffs from securing a place to live advances no legitimate state interest and is so irrational that it runs afoul of the Due Process Clause.

**B. The School Bus Stop Provision Violates the Substantive Due Process Clause As Applied to Children on the Registry.**

There are 14 children on Georgia's sex offender registry, four of whom live in Chatham County.[66]  All four – including Rashad Wright, age 14, and Germany

---

[66]    <u>See</u> Mica Doctoroff Decl. (Ex. 9 ¶ 14); Peter Wagner Decl. (Ex. 3 ¶ 15).  <u>See</u> <u>also</u> O.C.G.A. § 39-1-1(a) ("The age of legal majority in this state is 18 years; until that age all persons are minors.")

Whitfield, age 16 – will be forced from their homes if the school bus stop

provision is enforced, in violation of the Due Process Clause.[67]

It is well established that parents and children have a right to live together

without governmental interference.  See Troxel v. Granville, 530 U.S. 57, 65 (2000)

("[T]he interest of parents in the care, custody, and control of their children . . . is

perhaps the oldest of the fundamental liberty interests recognized by this

Court."); Santosky v. Kramer, 455 U.S. 745, 753 (1982); Stanley v. Illinois, 405 U.S.

645, 651 (1972); Meyer v. Nebraska, 262 U.S. 390, 399 (1923).  The "integrity of the

family unit" is further protected by the Due Process Clause.  Stanley, 405 U.S. at

651; Doe By and Through Doe v. Public Health Trust of Dade County, 696 F.2d

901, 908 (11th Cir. 1983) (recognizing "a constitutional right of continuing

parental oversight").  The school bus stop provision substantially impedes the

right of parents and children to live together by making it impossible for a child

on the registry to find a permanent home without facing a perpetual risk of

eviction.  Mann, 282 Ga. at 755 (finding that O.C.G.A. § 42-1-15 is so extreme that

"there is no place in Georgia where a registered sex offender can live without

being continually at risk of being ejected.").

---

[67]    See id.  See also Rashad Wright and Brenda Williams Decls. (Ex. 13);
Germany Whitfield and Robert Whitfield Decls. (Ex. 14).

Even under the rational basis test, the Statute cannot stand as applied to children.  See State v. C.M, C.D.M, and S.D., 746 So.2d 410, 419 (Ala. Ct. Crim. App. 1999) (striking down residence restriction as applied to juvenile sex offenders whose parents lived within 1,000 feet of child care centers and finding that the "provisions of the Act as applied to juveniles are excessive").  In C.M, C.D.M, and S.D, the Alabama Court of Criminal Appeals held:

> [C.]M. and C.D.M. are under the minimum work age and are unable to support themselves.  These juveniles would become wards of the state if they were not allowed to return to their families. . . .We are also concerned about the effect this law has on the parents and siblings of a juvenile sex offender.  The Act forces a parent who has children other than the juvenile sex offender to choose which child may live with the parent.  Certainly, no parent should have to make this choice.  Id. at 415, n. 8.

It shocks the conscience to turn children into nomads, requiring them to be "repeatedly uprooted and forced to abandon homes."  Mann, 282 Ga. at 756.

### C. The School Bus Stop Provision Violates Substantive Due Process As Applied to Plaintiffs Whitaker, York, and Others Convicted as Teenagers of Consensual Sodomy with Other Teenagers of Like Age.

As the Georgia Supreme Court recently recognized, the United States government has found that 55% of 15- to 19-year-old boys and 54% of 15- to 19-year-old girls have engaged in oral sex.[68]  Named plaintiffs Wendy Whitaker,

---

[68]    See Humphrey v. Wilson, 282 Ga. 520, 529, n. 42, 652 S.E.2d 501, 508, n.42 (2007) (citing Sexual Behavior and Selected Health Measures: Men and Women 15-44 Years of Age, United States, 2002, published by the Nat'l Center for Health

30

Jeffery York and others engaged in consensual oral sex as high school students, were convicted of "sodomy," and are on the registry.[69]

It "shocks the conscience" to drive persons from their homes and communities and to subject them to recurring evictions for engaging in consensual sex as high school students with other high school students of like age.  Carr v. Tatangelo, 338 F.3d 1259, 1271 (11th Cir. 2003) (describing "shocks the conscience" standard).  There is simply no rational reason, moreover, to apply the school bus stop provision to Wendy Whitaker and others in her position.  Forcing Whitaker to change residences at the whim of the local school board serves absolutely no purpose from a public safety perspective.[70]

The school bus stop provision is further irrational as applied to Whitaker, Linaweaver, York, and others with similar convictions given the "Romeo and Juliet" exception to § 42-1-12 – an exception (made effective July 1, 2006) to ensure that teenagers of like age who engage in consensual sex will not have to

Statistics, a branch of the Centers for Disease Control and Prevention (http://www. cdc.gov/nchs/products/pubs/pubd/ad/361-370/ad362.htm)).

[69]   See Defs' Ex. 1, 2, 10, TRO Hearing, June 26, 2006 (containing conviction records of named plaintiffs Wendy Whitaker, Joseph Linaweaver, and Jeffery York); see also Defs' Mot. for Filing of Evidence [Doc. No. 23].

[70]   See Depo. of Inv. David Rush, June 22, 2009 at 30 (Ex. 19) ("[I] think Ms. Whitaker shouldn't be on the registry.")

register as sex offenders.[71]  The "Romeo and Juliet" exception "reflect[s] a

decision by the people of this State that the severe felony punishment and sex

offender registration imposed on" persons like Whitaker and others "make[s] no

measurable contribution to acceptable goals of punishment."  Humphrey, 282

Ga. at 529.

       Unfortunately for Whitaker, Linaweaver and York, the "Romeo and Juliet"

exception applies only prospectively to persons whose convictions occurred on

or after June 30, 2001.  See O.C.G.A. § 42-1-12(a)(9)(B),(C), (e).  Only because their

"criminal" acts occurred before June 30, 2001, Whitaker, Linaweaver, and York

must register as sex offenders for life and comply with residence conditions that

treat them as if they are sexual predators, where there is absolutely no basis in

fact for that treatment.  There is no rational reason to apply this "extraordinary

reduction in punishment," Humphrey, 282 Ga. at 529, prospectively only, while

continuing to subject Whitaker and others to the Statute's expansive restrictions.

As such, the school bus stop provision, as applied to Whitaker, Linaweaver,

York, and others convicted of consensual sex as high school students with other

---

[71]     In 2006, Georgia's sodomy statute was revised to provide that if: (1) the victim is between 13 and 16, (2) the person convicted of sodomy is 18 or younger, and (3) the person convicted is no more than four years older than the victim, that person will be guilty of a misdemeanor and will not have to register as a sex offender.  See O.C.G.A. § 16-6-2(d); § 42-1-12(a)(9)(C).

teenagers of like age, "furthers no legitimate state interest which can justify its

intrusion." <u>Lawrence</u>, 539 U.S. at 578. [72]

### D. The School Bus Stop Provision Violates the Substantive Due Process Clause As Applied to Persons in Nursing Homes.

Unlike sex offender residence laws in other states, Georgia's school bus

stop provision does not make an exception for persons who no longer pose a

threat due to infirmity, illness, or disability. [73]  As such, the following nursing

home residents will be evicted by the Statute absent an injunction:

- Donald Faulk resides at Riverview Health and Rehabilitation Center within 1,000 feet of a school bus stop in Chatham County; he is confined to a wheelchair and has epilepsy.[74]

---

[72]    <u>See</u> <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 448 (1985) (holding that zoning ordinance failed rational basis test because city had no evidence to support its position that group home for mentally retarded would pose a special threat to the city's legitimate interests); <u>Open Homes Fellowship, Inc. v. Orange County</u>, 325 F. Supp.2d 1349 (M.D. Fla. 2004) (granting plaintiffs' motion for summary judgment where county offered no reasonable explanation for its position that substance abuse recovery program was threat to safety).

[73]    <u>Cf.</u> S. Carolina Stat. Ann. § 23-3-535 (C)(4-7) (exempting sex offenders who reside in nursing homes, homeless shelters, mental health facilities, and certain group homes from the sex offender residence restrictions); 57 Okl. St. Ann. § 590 (prohibiting sex offenders from living near schools or parks, but explicitly exempting persons "residing in a hospital or other facility certified or licensed by the State of Oklahoma to provide medical services").

[74]    <u>See</u> Donald Faulk Decl., Sept. 4, 2009 (Ex. 17).

- Elmer Holloway resides at Oceanside Nursing and Rehabilitation Center within 1,000 feet of a school bus stop in Chatham County.[75]

In 2006, other plaintiff class members – including a man in hospice care with weeks to live and an Alzheimer's patient — were forced to seek injunctions to block their evictions from nursing homes.[76]  Forcing nursing home patients out of their care facilities because they live near a school bus stop "shocks the conscience," Carr, 338 F.3d at 1271, and fails the rational basis test.  See Joel v. City of Orlando, 232 F.3d 1353, 1358 (11th Cir. 2000).  As applied to plaintiffs in nursing homes, "the relationship between the classification and the goal" of protecting children from sex offenses is "so attenuated as to render the distinction arbitrary or irrational."  See id.; Mikaloff, 2007 WL 2572268 at *11 (finding sex offender residence law excessive where "[a] feeble, aging paraplegic must leave his home just as a younger one.").  A civilized society does not turn

---

[75]    See Elmer Holloway Decl., Sept. 4, 2009 (Ex. 16).

[76]    See Pls' Mot. for Prelim. Inj., Oct. 12, 2006 [Doc. No. 99]; Consent Order, Oct. 19, 2006 [Doc. No. 105] (agreement between plaintiffs and Cherokee County Sheriff to permit plaintiff to remain in nursing home within 1,000 feet of a church pending resolution of this action); Consent Order, Oct. 17, 2006 [Doc. No. 104] (agreement between plaintiffs and Sheriff of Candler County to permit three plaintiffs to remain in nursing home within 1,000 feet of a church pending resolution of this case); Resp. of Sheriff Whittle to Pls' Mot., Oct. 13, 2006 [Doc. No. 102] (permitting certain plaintiffs to remain in nursing homes pending resolution of this case).

elderly, disabled people out on the street or force them to jail for conduct adjudicated and punished long ago.

<u>CONCLUSION</u>

Plaintiffs respectfully request that the Court grant *Plaintiffs' Motion for Summary Judgment*, enjoin defendants from enforcing the school bus stop provision, and grant such further relief as justice requires.

Respectfully submitted this 28th day of September, 2009.

SOUTHERN CENTER
FOR HUMAN RIGHTS

**<u>s/ Sarah Geraghty</u>**

Stephen B. Bright
(Ga. Bar No. 082075)
Lisa Kung
(Ga. Bar No. 430302)
Sarah Geraghty
(Ga. Bar No. 291393)
Gerald R. Weber
(Georgia Bar No. 744878)
83 Poplar Street, N.W.
Atlanta, Georgia  30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440
sbright@schr.org
lkung@schr.org
sgeraghty@schr.org
gweber@schr.org

CERTIFICATION OF COMPLIANCE WITH L.R. 5.1B

Pursuant to L.R. 7.1, I, Sarah Geraghty, hereby certify that this document

has been prepared in compliance with Local Rule 5.1B.

Dated this 28th day of September, 2009.

**s/ Sarah Geraghty**

Sarah Geraghty
(Ga. Bar No. 291393)
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia  30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440
sgeraghty@schr.org

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served the foregoing *Motion for Summary Judgment* upon Defendants by causing a true and correct copy thereof to be delivered by the Court's ECF filing system to Defendants' counsel of record at the following addresses:

Mr. Joseph Drolet
Ms. Devon Orland
Office of the Attorney General
40 Capitol Square
Atlanta, GA 30334

Mr. David E. Hudson
Hull, Towill, Norman, Barrett & Salley, PC
P.O. Box 1564
Augusta, GA 30903-1564

This 28th day of September, 2009.

**s/Sarah Geraghty**
Sarah Geraghty
(Ga. Bar No. 291393)
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440

*Attorney for the Plaintiffs*

37