IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| WENDY WHITAKER, et. al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | No. 4:06-cv-140-CC |
| SONNY PERDUE, et. al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs file this reply brief in response to *Defendants' Response to Plaintiffs' Motions for Summary Judgment* and state as follows:

A. TAKINGS CLAUSE CLAIM

1. There can be no dispute that O.C.G.A. § 42-1-15(b), by its express terms, violates the Takings Clause as applied to renters like plaintiffs Allison and Collins. Faced with incontrovertible evidence of the Statute's unconstitutionality, the state defendants ask Allison and Collins to trust their assurances that the Statute, as written, will not be applied to them. This non-binding, non-stipulated assurance is cold comfort to Allison, Collins, and other renters subject to a 10 to 30 year prison sentence if

they remain in their rented residence after a prohibited location moves within 1,000 feet of it. Defendants, moreover, do not address the "voluntary cessation" doctrine that overwhelmingly supports plaintiffs' request for an order from this Court resolving the parties' dispute pertaining to renters.

2. The state defendants further contend that § 42-1-15(b) will not be enforced according to its terms because "[t]his is a case in which the highest court in Georgia has ruled." (Defs' Br. at 4). <u>Mann v. Department of Corrections</u>, 282 Ga. 754 (2007), however, did not consider § 42-1-15(b) as it applied to a <u>renter</u> of property, but rather involved a <u>homeowner</u>. While plaintiffs agree that the principles articulated by the Supreme Court in <u>Mann</u> apply to renters, there has been no ruling by Georgia's highest court (or any court) on how § 42-1-15(b) should be interpreted as applied to renters.

3. The sheriffs have signed a stipulation pertaining to renters that arguably binds them <u>for the duration of this litigation</u>. It does nothing beyond that. The state defendants declined to enter a consent order or a stipulation. Without an order from this Court, Allison, Collins, and others will continue to be exposed to 10 to 30 years in prison by a

statute that is patently unconstitutional as written. "[I]t is the duty of the courts, when they *have* jurisdiction, to declare unconstitutional any law that violates a protected right." American-Arab Anti-Discrimination Committee v. Reno, 132 F.3d 531, 533, n. 2 (9th Cir. 1997) (finding that courts may not sidestep the duty to invalidate an unconstitutional law where such an approach would "amount[] to nothing less than rewriting the statute").

B.   "SCHOOL BUS STOP" SUBCLASS CLAIMS

4. Defendants offer no evidence to refute plaintiffs' showing regarding the impact of the school bus stop provision in Bulloch, Chatham and Columbia counties. Instead, defendants urge this Court to disregard Peter Wagner's maps for a variety of technical reasons.

5. Plaintiffs will respond separately to *Defendants' Notice of Objections to the Declaration of Peter Wagner* [Doc. No. 271]. Mr. Wagner's maps, however, are not the only evidence of the sweeping impact of the school bus stop provision. Plaintiffs' maps are entirely in keeping with the findings of numerous state and county law enforcement officials who mapped the scope of this provision in 2006. Plaintiffs attach to this brief maps created by the Bibb (Ex. 1), Cobb (Ex. 2), DeKalb (Ex. 3), and

Richmond (Ex. 4) county sheriffs' offices in preparation for enforcement of the school bus stop provision in 2006. Like plaintiffs' maps, these maps show that the school bus stop provision, if implemented, would render nearly all of these counties off limits to plaintiffs.

6. Plaintiffs' maps are also consistent with testimony from numerous law enforcement officers who told this Court in July 2006 about the enormous impact the school bus stop provision would have in their jurisdictions.[1] Specifically, sheriffs' offices in Bibb, Cherokee, Cobb, DeKalb, Forsyth, Gwinnett, Paulding, and Rockdale counties, among

---

[1] Sheriff Ted Paxton testified that all 60 people on the registry in Forsyth County would have to move due to the bus stop provision. See Tr. of Hearing, July 11-12 [Doc. No. 42, 43] at 23. Investigator Russell Finley testified that in Cobb County, all but 4 of the approximately 200 sex offenders would have to move from the county's bus stops. See id. at 37-38. Captain David Davis testified that 222 of 230 sex offenders in Bibb County would have to move. See id. at 49-50. A DeKalb County official testified that all 490 sex offenders in that county would have to move. See id. at 62. Corporal Karen Pirkel testified that 277 of 278 sex offenders in Gwinnett County would have to move, all due to bus stops. See id. at 85, 87. Sergeant Jay Baker testified that 88 of 95 sex offenders in Cherokee County would have to move. See id. at 88. Investigator Gene Higdon of Rockdale County testified that 51 of 52 sex offenders would have to move due to the bus stop provision. See id. at 159-60. See also Decl. of Detective Jodie Askea, June 27, 2006 [Doc. No. 19-4] (stating that 90 of 100 offenders in Paulding County would have to move, most due to school bus stop provision).

other counties, all had imminent plans to remove all or nearly all sex offenders from their homes due to the bus stop provision.[2]

7. To further demonstrate the broad impact of the school bus stop provision, plaintiffs provided the Court with declarations from persons who reside in "school bus stop" counties, including the parents of two children on the registry who live within 1,000 feet of designated school bus stops in Chatham County.[3]

8. Defendants' only effort to dispute plaintiffs' evidence of the impact of the school bus stop provision is their claim that "12 of 42" sex offenders in Columbia County were affected by the bus stop provision in 2006. (Defs' Br. at 6).  Contrary to Defendants' claim, Columbia County Investigator David Rush actually stated that 12 people were required to move in the 72 hours "prior to the injunction . . . which basically prohibited us from enforcing it."[4]

---

[2]   See supra n. 1.

[3]   See e.g. Brenda Williams Decl., Sept. 11, 2009 and Robert Whitfield Decl., Sept. 4, 2009 [Ex. 13 and 14 to Doc. No. 262].  Defendants have not addressed the fact that the school bus stop provision will evict children from their homes.

[4]   David Rush Depo. June 22, 2009 at 56-57 [Ex. 19 to Doc. No. 262].

5

9. Defendants further conclude, without evidence in support, that "Mann would exempt a large percentage of sex offenders" if a "designation [of school bus stops] were made." (Defs' Br. at 8). In fact, discovery from the sheriffs revealed only 134 persons exempt by the homeownership provision in section 42-1-15(f). As for renters, section 42-1-15(b) does not protect them. (See supra § A). Even assuming that section 42-1-15 will not force renters from their homes during the term of any existing lease, plaintiffs in "school bus stop" counties will still have to leave those counties once their lease terms are complete. Since most residential leases are one year in duration, nearly all renters will be forced from "school bus stop" counties within one year of designation, even under defendants' version of the facts.

10. Defendants next state "[p]laintiffs suggest that 900 out of Fulton County's more than 1,235 sex offenders *might* have had to move *if* school bus stops had been designated." (Defs' Br. at 7) (emphasis added). This figure – 900 persons subject to eviction – did not come from plaintiffs. It came from a Department of Corrections official.[5]

---

[5] See Depo. of Ahmed Holt, June 2, 2009 at 16-17 [Ex. 4 to Doc. No. 262] ("[f]rom my last numbers, roughly 900 will have to move . . . .").

Although (public) school bus stops are not currently designated in Fulton County or the counties surrounding Bulloch, Chatham, or Columbia counties, it is not unreasonable to expect that additional designations will follow if the school bus stop provision is enforced. It is only this Court's orders enjoining enforcement that have stopped additional bus stop designations. If the school bus stop provision is enforced and nearly all sex offenders have to leave the "school bus stop" counties, other counties will likely designate school bus stops to avoid an influx of sex offenders into their jurisdictions.

11. As for defendants' attempt to distinguish the cases holding various sex offender residence laws unconstitutional (Defs' Br. at 9-11), these cases are only distinguishable to the extent that they considered laws much more limited in scope than the one at issue here. Mikaloff v. Walsh, 2007 WL 2572268 at *1 (N.D. Ohio Sept. 4, 2007), for example, involved a challenge to a law prohibiting sex offenders from living within 1,000 feet of schools or daycare centers. State v. Pollard, 908 N.E.2d 1145 (Ind. 2009) challenged a statute prohibiting sex offenders from living within 1,000 feet of a school, youth center, or park. Both laws were held to violate the *ex post facto* clause even though the "effect" of these laws

was nowhere near as dramatic as the school bus stop provision in Georgia.

C.   *EX POST FACTO* SUBCLASS CLAIM

12. Defendants challenge plaintiffs' assertion that approximately 90% of sex offenders were convicted before 2006. (Defs' Br. at 14-15). Plaintiffs attach as Exhibit 5 a document containing information downloaded from the GBI's sex offender registry showing that approximately 15,765 sex offenders were convicted before 2006.[6] Plaintiffs otherwise rest on their initial briefing with respect to this claim.

D.   VAGUENESS CLASS CLAIM

13. Defendants state that the existence of Georgia's Open Meetings law renders the term "school bus stop" clear. If this is so, why, then, did numerous sheriffs mistakenly interpret the provision and come within 48 hours of erroneously forcing hundreds of people from their homes? Why, indeed, were numerous people, including plaintiff Lori Collins,

---

[6]   As of September 19, 2009, according to the registry database, downloadable at http://gbi.georgia.gov, there were 17,468 sex offenders on the registry in Georgia. Of those, 17,468 registered sex offenders, 15,765 were convicted prior to July 1, 2006. By dividing 15,765, the number of registered sex offenders convicted prior to 2006, by 17,468, the total number of sex offenders on the registry, plaintiffs arrived at the 90% figure cited in their initial brief.

actually evicted from homes in counties in which school bus stops were not "designated"?

14. The Open Meetings law did not prevent utter chaos from ensuing when the school bus stop provision was set to become effective in July 2006. During the 2006 hearings before this Court, even the state defendants acknowledged the confusion caused by the school bus stop provision:

> THE STATE: What is troubling, I think, for everybody involved in this situation is there has been an inundated panic with sheriffs holding up maps, saying we don't know.[7]

15. This admission that the school bus stop provision caused "an inundated panic" and that the sheriffs didn't "know" how to interpret the Statute weighs heavily in favor of a finding of vagueness. Compounding this admission, the state further acknowledged that it was unclear what, exactly, a school board had to do to "designate" bus stops:

> THE STATE: The Legislature made a decision to define school bus stops as those designated by the local school board. Now whether or not it's sufficient to have a designee who creates the list and then has the school board approve it, what criteria is needed, that needs to play itself out, I think, in the Georgia courts . . . .

---

[7] See Tr. of Hearing, July 11, 2006 at 13 [Doc. No. 42] (Sr. Asst. Att'y Gen. Devon Orland).

> THE COURT: Most people would assume that if a school board gave you a list of school bus stops they were probably designated by the local school board.
>
> THE STATE: Well, I can't help what people assume. I think the statute speaks for itself, Your Honor.
>
> THE COURT: The statute doesn't clarify that, though.[8]

16. A statute that infringes so substantially on a person's home and family relationships – and which subjects violators to 10 to 30 years in prison – must provide clear notice of what is required. The school bus stop provision fails so monumentally in this regard that numerous, reasonable law enforcement officials misinterpreted the provision, mistakenly forcing plaintiffs to abandon homes. There is no reason to believe that the chaos that ensued in 2006 will not again ensue if the school bus stop provision is permitted to go into effect.

E.  VOLUNTEER SUBCLASS CLAIM

17. Defendants' claim that "one-fifth of 1%" of sex offenders have been restricted from volunteering at a church is inaccurate. (Defs' Br. at 26). Neither have plaintiffs "assert[ed]" that "at least one hundred probationers have been ordered, advised, or encouraged not to

---

[8] See id. at 16.

volunteer at a church." (Defs' Br. at 24). The volunteer provision does not apply just to 100 probationers or to "one-fifth of 1%" of sex offenders, but rather to every person on the registry.

18. Although the state defendants promise in legal briefs that their employees will not misinterpret the Statute in a way that offends the Constitution, promises in legal briefs do not remedy the fundamental vagueness of the volunteer provision, nor do they mitigate the chilling effect that a potential 10 to 30 year prison term has on plaintiffs who wish to practice their faith.

F.     CONCLUSION

Plaintiffs respectfully request that this Court enter an order granting Plaintiffs' Motions for Summary Judgment.

Respectfully submitted this 9th day of November, 2009.

                                  SOUTHERN CENTER
                                  FOR HUMAN RIGHTS

                                **s/ Sarah Geraghty**

                                Stephen B. Bright
                                (Ga. Bar No. 082075)
                                Lisa Kung
                                (Ga. Bar No. 430302)
                                Sarah Geraghty
                                (Ga. Bar No. 291393)

Gerald R. Weber
(Georgia Bar No. 744878)
83 Poplar Street, N.W.
Atlanta, Georgia  30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440
sbright@schr.org
lkung@schr.org
sgeraghty@schr.org
gweber@schr.org

CERTIFICATION OF COMPLIANCE WITH L.R. 5.1B

Pursuant to L.R. 7.1, I, Sarah Geraghty, hereby certify that this document has been prepared in compliance with Local Rule 5.1B.

Dated this 9th day of November, 2009.

        **s/ Sarah Geraghty**

        Sarah Geraghty
        (Ga. Bar No. 291393)
        Southern Center for Human Rights
        83 Poplar Street, N.W.
        Atlanta, Georgia  30303-2122
        Tel: (404) 688-1202
        Fax: (404) 688-9440
        sgeraghty@schr.org

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing *Reply in Support of Motion for Summary Judgment* upon Defendants by causing a true and correct copy thereof to be delivered by the Court's ECF filing system to Defendants' counsel of record at the following addresses:

Mr. Joseph Drolet
Ms. Devon Orland
Office of the Attorney General
40 Capitol Square
Atlanta, GA  30334

Mr. David E. Hudson
Hull, Towill, Norman, Barrett & Salley, PC
P.O. Box 1564
Augusta, GA  30903-1564

This 9th day of November, 2009.

                                      **s/ Sarah Geraghty**
                                      Sarah Geraghty
                                      (Ga. Bar No. 291393)
                                      Southern Center for Human Rights
                                      83 Poplar Street, N.W.
                                      Atlanta, Georgia  30303-2122
                                      Tel: (404) 688-1202
                                      Fax: (404) 688-9440

                                      *Attorney for the Plaintiffs*